COVINGTON, Judge.
This is a devolutive appeal from a judgment of the district court dismissing the plaintiffs’ suit for damages against the defendants, The Optimist Club of Downtown Baton Rouge, Louisiana, Inc., and the club’s liability insurer, St. Paul Fire and Marine Insurance Company. The suit was instituted for personal injuries allegedly sustained by Mrs. Ray Reech on the evening of October 28, 1978, while she was accompanying her three children through a “haunted house” which was sponsored and operated as a Halloween fund-raising project by the Optimist Club. The “house” was arranged with four rooms decorated with Halloween paraphernalia, designed to frighten or startle the patrons as they passed through each room. The house was primarily lighted with black lights and strobe lights to illuminate the passage way to accent the masks and costumes worn by the “actors.” There were also continuous Halloween-type sound effects, such as screams and wolf howls.
The defendants generally denied liability for the injuries and damages sustained; and also pled the affirmative defenses of contributory negligence and/or assumption of risk so as to bar recovery by the plaintiffs.
Mrs. Reech described the incident which resulted in her injuries as follows:
“Q. And this haunted house essentially was not — there is no material difference between this one as far as you know than one that you had been in wherever it was located?
A. Except for that place where you couldn’t see because of the darkness.
Q. And you did expect, although you didn’t expect to be frightened, well, I wouldn’t think an adult would expect to be frightened but you would expect yourself and all the other people be startled from time to time when you hear sound effects or lights or some animation by the people in there. That’s when you’d expect to be startled; would you not?
A. Yes. sir.
And that s what happened; didn’t it? O’
Yes, sir. <!
And obviously you didn’t expect or didn’t intend or didn’t want to get your nose broken but you did expect to have people startled and you expected or anticipated or thought there might be some jostling and pushing around; would you not? O*
Yes, sir. <1
You expected the people in there in front of you or behind you to be startled and jump and perhaps push you or touch you or step on your foot or whatever? O’
On my feet, yes. <1
And the only thing different about this instance from what you anticipated when you went in there was, you didn’t anticipate getting your nose broken? O*
I didn’t anticipate being shoved into a wall.
Well, you didn’t anticipate getting your nose broken but you did anticipate being stepped on, pushed, elbowed and shoved while you were in there? .©
But not so violently. <$
That’s right but answer my question. You did anticipate all those things but you just didn’t anticipate having the result to be your nose getting broken? You anticipated all those things, did you not? O'
To a slight degree, yes. <1
And what’s your best recollection of the people that were involved in your little group were about how many? Q*
Ten to twelve people. <!
Okay. And the size of the group was no particular problem I take it? Q*
What do you mean? <!
Well, I mean, they weren’t being rowdy and the rooms weren’t overcrowded or anything of that nature, I take it? O’
*401 A. Not that I remember.
Q. Do you recall whether or not they had any type of sound effects at all?
A. I can’t remember any music. I can remember the screaming and hollering, you know, from people. You could hear those that were in the front of you screaming and then you could [hear those] in the back of you screaming but I don’t know if there was any music.
Q. You don’t know whether they had any type of recorded sound effect whether it be music or not, whether it be goulds [sic] laughing or screeching or other weird Halloween type noises?
A. There were so many noises from— so much noise, different noises from the people, and from those that were dressed up that were masqueraded. I remember hearing those noises.
Q. Now, how far was it when you left that last room you were in into the hall where the incident occurred? How far did you go at that time as you recall before you felt yourself being shoved into the wall?
A. Not very far, a matter or maybe four or five feet.
Q. Had you made the turn at that point?
A. You had to have made the turn to get into the hall.
Q. You did anticipate — and the purpose for going there, if not for you, certainly for your children, was so they could enjoy the thrill, the excitement, the scaring procedure?
A. Right.
Q. And you knew that that was — basically, that’s the total and sole purpose of a haunted house anyway?
A. Yes, it’s part of Halloween.
Q. That’s right. And you know that when the children or the other people whether they be children or grown-ups or otherwise, that when these apparitions suddenly jump out at them, flashing lights and noises, that they will act in a manner that startles, shall we say, sudden movements, backwards, forwards, sideways or otherwise?
A. Yes.”
The plaintiffs claim that the Optimist Club was negligent in its design, construction and operation of the “haunted house” in failing to properly control the movement of patrons through the amusement area and in failing to maintain adequate lighting for safe movement of patrons. We find no merit to this contention. See Bonanno v. Continental Casualty Company, 285 So.2d 591 (La.App. 4 Cir. 1973).
The trial judge, in his oral reasons for judgment, made the following observations and conclusions:
“The testimony is that Optimist Club had members who were stationed at the door and the entrance into the haunted house to control the number of peoples who would enter into the haunted house at one time. Mr. Gremillion said that normally this group was controlled between numbers of fifteen and twenty. That there were attendants available in case there were unruly people who were getting ready to enter into the haunted house and the attendant would be available to go with that group to control it. As Mrs. Reech testified that she did not recall any unruly people in this particular group that she [was] involved with. According to the testimony of Mrs. Reech, Sharon Bordelon and April Reech were one, two, three in the group that went in and as they proceeded through the different halls and rooms of the haunted house, they came to the part where Mrs. Reech got injured. The testimony has been that the rooms in the haunted house were decorated with scenes for the purpose of scaring and startling the patrons, consisting of what would normally be called Halloween paraphernalia. Mr. Gremil-lion indicated that there was a sound track that was playing that had various sounds from a wolf cry to dogs barking to screams, all to promote the purpose of the *402 haunted house which is to scare, startle, excite patrons who might enter into the haunted house. According to the testimony of April Reech, she indicated that she was getting ready to proceed down a hall when she was shoved and from that the court assumed that she bumped into Sharon who bumped into Mrs. Reech who struck her face on the side of the wall and fell to the floor. Mr. Gremillion testified in his exhibit, suggest that the instant it happened, in front of his station where he was an actor, in that exhibit, defendant exhibit number two[,] Mr. Gremillion pointed out the area where Mrs. Reech was injured. In fact he stated he was the one who came to her assistance and took her out the back door. Mrs. Reech and her children have testified that the area where the injury occurred was dark, pitch dark, using various synonyms to describe the light. The diagram, D-2, Mr. Gremillion presented to the court. The area where Mrs. Reech was injured was actually more or less in front of what I would consider a scare station which black lights were used to illuminate the various masks that were being worn. In this particular instance, Mr. Gremillion was wearing the ‘alien’ mask and he had control of a strobe light which he would turn on at various intervals for the purpose of startling individuals when they came into the room. Apparently, on this evening, someone was behind April and they were startled. They bumped Sharon who bumped Mrs. Reech. The court has had the opportunity to review the memorandums that were presented by the parties in this particular suit and feel that both have had no showing of any defects whatsoever in the haunted house. The court noted in the petition, paragraph four, it was alleged that someone in front of Mrs. Reech sud-denOy] and without warning stepped back and jumped into her, resulting in the injury. And that the accident sued upon, under paragraph five, was a fault of defendant in his failure to protect patrons from dangers of the haunted house and from other patrons on the premises. This court in the case of Bonanno versus Continental Casualty, 285 So.2d 591, Fourth Circuit, 1973, stated, obviously the purpose of a haunted house is to startle people, is to cause patrons to react in a bizarre, frightening and unpredictable way. • Of course, Mrs. Reech testified that she didn’t go there to be scared, she went there to assist her children. At the same time, she stated that she was startled and who wouldn’t be when objects, actors would jump out at you, that you wouldn’t perhaps be anticipating. I, in this particular case, realize that the premises that were available for Mrs. Reech to walk through that evening, the duty that’s owed by the Optimist Club in maintaining the premises are to be considered in connection with the purpose. The purpose obviously was the haunted house to affect people as I previously mentioned. There were no defects in the flooring, nothing fell that was out of the ordinary. From the evidence before the court, it really boils down to whether or not it was an unruly crowd, which honestly there wasn’t in the court’s opinion, or secondly, whether or not the area where Mrs. Reech was injured, whether or not there was an insufficient amount of light. One of the witnesses was asked whether or not the lights were as bright as those in the courtroom. Obviously they weren’t because all the effect of a particular scare station would be lost with bright lights like this. The court does not find where the Optimist Club and/or their insurer has committed any acts of negligence whatsoever in the manning of the haunted house and/or maintaining the scare stations and/or in constructions of the various halls and rooms including availability of lighting.”
We have reviewed the record carefully and find that it supports the factual determinations of the trial court. Moreover, as in Bonanno v. Continental Casualty Company, supra at 592, we hold that Mrs. Reech’s assumption of risk in going through this Halloween attraction bars her recovery. She necessarily assumed the risk of being *403 startled, jostled and pushed about when she entered the “haunted house,” which was an ordinary risk of attending such attraction.
For the foregoing reasons, the judgment of the trial court is affirmed, at appellants’ costs.
AFFIRMED.